**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ARIEL CHRISTINA EURE, et al.,** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | **CIVIL ACTION** |
| v. | : | |
| | : | **NO. 18-1891** |
| **FRIENDS' CENTRAL SCHOOL** | : | |
| **CORP., et al.,** | : | |
| | : | |
| **Defendants.** | : | |

## MEMORANDUM

Tucker, J.                                                                          August 2nd , 2019

Presently before the Court are Defendants' Motion to Dismiss (ECF No. 7), and Plaintiffs'

Response in Opposition (ECF Nos. 11, 12). Upon careful consideration of the Parties'

submissions, and for the reasons set forth below, Defendants' Motion is DENIED IN PART and

GRANTED IN PART.

## I.      FACTUAL BACKGROUND

Plaintiffs Ariel Eure and Layla Helwa (collectively "Plaintiffs") bring this employment

discrimination action against Defendants Friends' Central School Corporation ("FCS"), Craig

Sellers ("Sellers"), Phillip Scott and Board Members John and Jane Does #1–29 ("Board")

(collectively "Defendants") after Defendants wrongfully suspended then discharged them from

their teaching positions at FCS. Compl. ¶ 2, ECF No. 1. On March 17, 2017, Plaintiffs filed

charges with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania

Human Relations Commission ("PHRC"); the EEOC issued a right to sue letter on March 12,

2018. Compl. ¶ 10.

Plaintiff Ariel Eure ("Eure") is a gay African-American female; Plaintiff Layla Helwa ("Helwa") is a gay female of Egyptian and Puerto Rican descent and a member of the Muslim faith. Compl. ¶¶ 3–4, ECF No. 1. Plaintiffs taught at FCS for two years before being suspended and subsequently fired. Compl. ¶¶ 3–4. FCS is a Quaker-based day school located in Wynnewood, Pennsylvania with over 800 students.  Compl. ¶ 5. Sellers is the FCS Head of School and Art Hall ("Hall") was Plaintiffs' immediate supervisor. Compl. ¶¶ 6, 11.

On May 4, 2016, three students asked to meet with Plaintiffs to discuss a potential "equal rights club" which would come to be known as the "Peace and Equality for Palestine" club ("Club"). Compl. ¶ 17. Helwa suggested that Dr. Sa'ed Atshan ("Dr. Atshan"), a Quaker professor at Swarthmore College, speak to the Club at FCS. Compl. ¶ 20. FCS approved of the speaker and Hall approved Eure's request to publicize the event. Compl. ¶ 21.

After Plaintiffs alerted Dr. Atshan about concerns the Club received from students, parents, and faculty members who viewed discussions of Palestine to be anti-Semitic, Dr. Atshan assured Plaintiffs that he would be able to handle the topic in a "sensitive and nuanced manner." Compl. ¶ 22. The event was to take place on February 10, 2017. Compl. ¶ 23.  On February 6, 2017, the event was posted[1] and announced during homeroom. Compl. ¶ 25. Later that day, Hall told Eure that a number of parents had reached out to the school to voice their opposition to the event and instructed Eure to cancel it. Compl. ¶ 27.

The next day, on February 7, 2017, Plaintiffs informed the Club that FCS had cancelled the event. Compl. ¶ 28.  Club members told Plaintiffs they intended to stage a walk-out in protest of FCS' cancellation of the event the following day. Compl. ¶ 28. On February 8, 2017, Eure emailed Dr. Atshan to notify him of the cancellation, explaining that "prominent families" at

---

[1] It is unclear from Plaintiffs' complaint how or where the announcement was posted.

FCS voiced their disapproval of the event. Compl. ¶ 29, ECF. No. 1. The walk-out occurred as planned on February 8, 2017 with approximately sixty-five students, Plaintiffs, and at least three other teachers in attendance. Compl. ¶ 30.

Later that day, Plaintiffs met with Hall and Assistant Head of School and Diversity Officer, Mariama Richards ("Richards"), to inform them that students were planning to have a discussion during the time Dr. Atshan was originally set to speak. Compl. ¶ 31. Hall and Richards suggested that Plaintiffs not attend the discussion because it would be "bad" for them and further suggested that, "as teachers of color," Plaintiffs needed to trust Hall and Richards who had more experience in a private school setting than did Plaintiffs. Compl. ¶ 31. Plaintiffs informed Hall and Richards that they would attend the discussion because the student hosts invited them. Compl. ¶ 31.

On February 10, 2017, the student-led discussion occurred and was attended by a dozen faculty members including Plaintiffs, Hall, and Richards. Compl. ¶ 34. Later that afternoon, Sellers asked to meet with Plaintiffs individually. Compl. ¶ 34. Sellers asked Plaintiffs the same questions, including why they failed to follow the directive from their supervisors instructing them not to attend the student-led discussion. Compl. ¶ 36. Plaintiffs responded that they had a duty to monitor the students. Compl. ¶ 36.

On February 12, 2017, Plaintiffs received an email requesting that they meet with Sellers off-campus the following morning. Compl. ¶ 37. At the meeting, Sellers informed Plaintiffs that they were being placed on administrative leave, effective immediately, due to their "single-minded approach to a complicated issue." Compl. ¶ 38. Plaintiffs were under the impression that Sellers would reinstate them within a week or so. Compl. ¶ 38. Hall informed Plaintiffs that they would be reinstated the following spring. Compl. ¶ 38.

In accordance with FCS policies and procedures, Plaintiffs filed a complaint with Sellers himself and with the Board on February 14, 2017, after hearing rumors of why they were placed on leave. Compl. ¶ 42, ECF No. 1. Plaintiffs requested that Sellers be disciplined for discrimination, but Plaintiffs never received a response to their complaint. Compl. ¶ 42. On February 16, 2017, Plaintiffs' counsel received a call from Margaret McCausland ("McCausland"), a neutral investigator appointed by FCS to investigate Plaintiffs' suspensions. Compl. ¶ 43. Plaintiffs never received a copy of McCausland's report. Compl. ¶ 44.

On February 13, 2017, Sellers sent a message to FCS families informing parents that FCS had "very real concerns about the conduct of [Plaintiffs] for their disregard of [FCS'] guiding testimonies, [including] community peace and integrity" and communicating that Plaintiffs were on "indefinite paid administrative leave" while a review was under way. Compl. ¶ 50. On February 14, 2017, Sellers and the Board sent another message which explained "two teachers were given explicit directives which they ignored" and that the teachers had been placed on leave. Compl. ¶ 51. Plaintiffs reference over a dozen news articles that were published in February 2017 reprinting the language from both of these messages. Compl. ¶ 52. In March 2017, two local news organizations reported on Plaintiffs' claims with the EEOC. Compl. ¶ 55. In those reports, FCS gave official statements categorizing Plaintiffs as employees who failed to "follow explicit directives" who were then placed on leave due to "their stated intentions going forward." Compl. ¶ 55.

On April 7, 2017, the Board published a statement that the investigation into Plaintiffs' allegations of discrimination and harassment had been completed and that the allegations were unsubstantiated. Compl. ¶ 56. On May 9, 2017, Sellers sent termination letters to Plaintiffs which contained no specific reason for the termination. Compl. ¶ 58. That same day, Sellers published a

public message informing FCS families that Plaintiffs would not be returning to the school. Compl. ¶ 59, ECF No. 1. Later that day, FCS extended an invitation for Dr. Atshan to speak at the school which Dr. Atshan declined. Compl. ¶ 61.

On May 10, 2017, FCS released another public statement regarding Plaintiffs' termination, reiterating that their contracts would not be renewed. Compl. ¶ 62. This statement was again covered by the media. Compl. ¶ 63. On September 1, 2017, Sellers sent a notice to FCS Alumni notifying them that the school was to be named in a lawsuit "connected with an employment issue that took place last February." Compl. ¶ 66.

Plaintiffs accuse Defendants of creating an illegally discriminatory environment at FCS. Compl. ¶ 68. Plaintiffs allege that Defendants singled out Plaintiffs to participate in issues involving race relations at the school. Compl. ¶ 15. Plaintiffs also reference several instances where white co-workers ignored directives and had complaints lodged against them, but those white co-workers were never placed on leave or fired. Compl. ¶ 69. Plaintiffs argue they were placed on leave and then fired as a result of their race, color, and sex. Compl. ¶ 2. Helwa further contends she was also discriminated against based on her religion. Compl. ¶ 2. Plaintiffs claim that the extensive media coverage of their suspension and termination, as well as the multiple statements made by Defendants, lowered Plaintiffs' reputations in the community and, prevented Plaintiffs from securing gainful employment following their termination. Compl. ¶ 107.

Plaintiffs seek to recover damages under Title VII of the Civil Rights Act of 1964 ("Title VII"), the Pennsylvania Human Relations Act ("PHRA"), and under tort claims of negligent supervision, retaliation, and defamation. Compl. ¶ 2. Defendants seek dismissal of this Complaint for Lack of Subject Matter Jurisdiction pursuant to Federal Rule of Civil Procedure

12(b)(1) and Failure to State a Claim under Federal Rule of Civil Procedure 12(b)(6). Mot. to

Dismiss, ECF No. 7.[2]

## II.     STANDARD OF REVIEW

A party may challenge subject matter jurisdiction under Federal Rule of Civil Procedure

12(b)(1) as either a facial or factual challenge. *Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir.

2016). Under a facial challenge, subject matter jurisdiction is challenged "without disputing the

facts alleged in the complaint." *Id.* The court therefore considers the allegations in the complaint

"in the light most favorable to the plaintiff." *Constitution Party of Pa. v. Aichele*, 757 F.3d 347,

358 (3d. Cir. 2014) (quoting *In re Scherring Plough Corp.*, 678 F.3d 235, 243 (3d Cir. 2012)).

By contrast, under a factual challenge, competing facts are presented to the court, allowing it to

"consider evidence outside the pleadings" relating to subject matter jurisdiction. *Davis*, 824 F.3d

at 346 (quoting *Aichele*, 757 F.3d at 358 (3d Cir. 2014)).  In a factual challenge, the plaintiff

carries the burden of proving that subject matter jurisdiction exists and the plaintiff's allegations

are not granted the presumption of truthfulness. *Davis*, 824 F.3d at 346.

To prevail on a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6),

"a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that

is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation omitted).

A claim is plausible when "the plaintiff pleads factual content that allows the court to draw the

---

[2] Defendants argue that all six of Plaintiffs' claims are barred under the Establishment Clause of
the First Amendment, therefore, the Court lacks subject matter jurisdiction over this matter.
Defs.' Mot. to Dismiss 9–19, ECF No. 7-3. Plaintiffs contend that any mention of Defendants'
association to the Quaker faith is merely to provide background information to "depict the nature
of the environment" described in the Complaint. Pls.' Mem. in Opp. to Defs.' Mot. to Dismiss
10, ECF No. 11. The Court agrees with Plaintiffs and finds that any mention of religion in
Plaintiffs' Complaint is intended to provide background information and, therefore, does not
implicate the Establishment Clause. Accordingly, the Court will not address Defendants' lack of
subject matter jurisdiction argument.

reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "Threadbare

recitals of the elements of a cause of action, supported by mere conclusory statements, do not

suffice." *Id*.; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Inquiry into

plausibility is context specific; therefore, the court must draw on its experience and common

sense. *Iqbal*, 556 U.S. at 679.

## III.    DISCUSSION

### A.   Plaintiffs Have Sufficiently Pled Title VII and PHRA Violations of Maintenance of a Hostile Work Environment, Discrimination, and Retaliation on the Bases of Race or Color, but Not on the Bases of Religion, Sex, or Sexual Orientation (Counts I and III)

Title VII prohibits discrimination against employees "on the basis of race, color, religion,

sex, and national origin." *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 173 (2011). The

PHRA offers similar protections and additionally protects employees based on age, handicap, or

disability. PHRA, 43 Pa. Stat. And Cons. Stat. Ann. § 952 (West 2019). PHRA violations are

analyzed under the same framework as Title VII violations. *Mandel v. M & Q Packaging Corp.*,

706 F.3d 157, 163 (3d Cir. 2013) ("Claims under the PHRA are interpreted coextensively with

Title VII claims.") (internal quotation marks and citations omitted). Counts I and III will,

therefore, be addressed concurrently.

Sexual orientation is not an explicitly protected class under Title VII or the PHRA.  *See*

*Pagan v. Gonzalez*, 430 F. App'x 170, 171–72 (3d. Cir. 2011) (discrimination based on sexual

orientation is not protected by Title VII); *Manocchio v. Children's Serv. Ctr. of Wyo. Valley*, No.

3:06cv710, 2007 WL 674590, at *3 n.3 (M.D. Pa. Feb. 28, 2007) ("[T]he PHRA does not

prohibit discrimination on the basis of sexual orientation."); *but see Guess v. Phila. Hous. Auth.*,

354 F. Supp. 3d 596, 603 (E.D. Pa. 2019) ("[D]iscrimination against gays and lesbians is

prohibited under Title VII insofar as it involves discrimination based on sex and gender

stereotypes.") (internal citation omitted). Accordingly, a plaintiff may not bring a Title VII or PHRA action on the basis of sexual orientation alone, but is entitled to protection if the discrimination suffered is "based on gender stereotypes [and is therefore considered] sex-based discrimination." *Semian v. Dep't of Military & Veterans' Affairs*, No. 3:17-CV-1183, 2018 WL 4038116, at *5 (M.D. Pa. Aug. 23, 2018) (relying on *Bibby v. Phila. Coca Cola Bottling Co.*, 260 F.3d 260, 262–64 (3d Cir. 2001)).

### 1. Plaintiffs Have Sufficiently Pled a Hostile Work Environment Claim in Violation of Protections Based on Race or Color

To state a claim of a hostile work environment under Title VII and the PHRA, the plaintiff must show that: (1) she suffered intentional discrimination because of her protected class, (2) the discrimination was severe or pervasive, (3) the discrimination detrimentally affected her, (4) the discrimination would detrimentally affect a reasonable person in like circumstances, and (5) respondeat superior liability exists. *Mandel*, 706 F.3d at 167. Only these prima facie elements of a hostile work environment claim need be established at the motion to dismiss stage "because it may be difficult for a plaintiff to prove discrimination before discovery has unearthed relevant facts and evidence." *Castleberry v. STI Group*, 863 F.3d 259, 266 (3d Cir. 2017) (internal citation omitted). In their Complaint, Plaintiffs assert a hostile work environment claim based upon "[d]iscrimination on the basis of race, color, religion, and/or sex." Compl. ¶ 78, ECF No. 1. Plaintiffs' pleadings have sufficiently satisfied all five elements of a hostile work environment claim to survive a motion to dismiss. However, Plaintiffs have successfully stated a hostile work environment claim on the bases of race or color only.

### i. Plaintiffs may have suffered intentional discrimination based on their race or color (Element One)

Discrimination in the workplace can be overt or "facially neutral." *Mitchell v. Wachovia Corp.*, 556 F. Supp. 2d 336, 349 (D. Del. 2008); *see also Brown-Baumbach v. B&B Auto., Inc.*, 437 F. App'x 129, 134 (3d Cir. 2011). Unlike an overt act of racial discrimination, such as the use of racial epithets, facially neutral claims require the plaintiff to show "surrounding circumstances that would expose the purportedly discriminatory nature of what is otherwise racially neutral conduct." *Mitchell*, 556 F. Supp. 2d at 349 (internal citation omitted). A plaintiff's mere speculation that an employer would have treated her differently if she were a different race does not sufficiently prove discrimination in the absence of evidence in the record. *Id.* at 350.

In analyzing allegations of facially neutral discrimination, courts must examine the overall scenario as opposed to individual incidents because it is "often difficult to determine the motivations of an action" taken by an employer. *Cardenas v. Massey*, 269 F.3d 251, 261 (3d Cir. 2001) (internal citation omitted). Courts also have broad discretion in deciding whether evidence of discrimination against employees other than the plaintiff is relevant to the plaintiff's claim of discrimination. *Mandel*, 706 F.3d at 167–68 (citing *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008)).

Plaintiffs claim that while white coworkers made transgressions such as ignoring directives, failing to attend mandatory staff meetings, and neglecting to turn in student grades in a timely manner, Defendants never punished those coworkers. Compl. ¶ 69, ECF No. 1. Plaintiffs further allege that after "the only black [male employee at FCS] . . . was placed on leave after a student made racial threats on his life," Defendants "cover[ed] up the real story by saying that he just needed time with his family." Compl. ¶ 68.

While these allegations do not constitute overt acts of discrimination, when viewed in the totality of the circumstances, these allegations may constitute facially neutral acts of discrimination based on race or color. Plaintiffs have not "merely speculated" that they would be treated differently if they were a different race or color; Plaintiffs have seemingly been disciplined more harshly than were white coworkers and, like their former minority coworker, were also placed on leave. Compl. ¶ 68. In their complaint, Plaintiffs provided scenarios where white coworkers engaged in misconduct and received little to no punishment. Compl. ¶ 69, ECF No. 1. Plaintiffs allege that they were treated adversely due to their race and color, ultimately resulting in their termination. Compl. ¶ 2. Though Defendants argue that Plaintiffs have insufficiently pled intentional discrimination, Defendants base this conclusion on case law that analyzes overt acts of discrimination only, such as the use of racial slurs and derogatory comments, and fail to analyze cases that examine facially neutral discriminatory acts. Defs.' Mot. to Dismiss 21, ECF No. 7-3. Taking Plaintiffs' allegations as true, Plaintiffs have sufficiently raised an inference that Plaintiffs were intentionally discriminated against on the bases of their race or color.

### ii. Defendants' alleged racial discrimination may have been severe or pervasive (Element Two)

To prove that a plaintiff suffered severe or pervasive discrimination, the "plaintiff must show that the workplace is permeated with discriminatory intimidation, ridicule, and insult . . . sufficiently severe or pervasive to alter conditions of the victim's employment and [to] create an abusive working environment." *Torres v. Deblasis*, 959 F. Supp. 2d 772, 782 (E.D. Pa. 2013) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002)) (internal quotation marks omitted). Unless "extremely serious," isolated incidents of discrimination will not meet the severe or pervasive standard. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); *see*

*Torres*, 959 F. Supp. 2d at 782 (finding that a plaintiff who complained of a series of isolated incidents was not "subject[ed] to an abusive working environment."); *but see Castleberry*, 863 F.3d at 265–66 (finding the isolated use of a racial epithet to be sufficiently severe; assigning menial tasks to African-American workers while white coworkers were assigned complex work was sufficiently pervasive). To determine whether alleged discrimination is sufficiently severe or pervasive to survive a hostile work environment claim, courts must consider the totality of the circumstances surrounding the alleged discriminatory behavior. *Davis v. City of Newark*, 285 F. App'x 899, 902 (3d Cir. 2008).

Plaintiffs were praised by Sellers and Hall several times in their personnel files, via text message, and through Twitter posts and were never disciplined before their suspension. Compl. ¶¶ 11, 16. ECF No. 1. These facts, provided by Plaintiffs, do not necessarily or readily lend themselves to a work environment that is "permeated with discriminatory intimidation, ridicule, and insult," nor one that creates "an abusive working environment." However, reading Plaintiffs' complaint liberally, Plaintiffs allege that the discrimination they eventually experienced was severe or pervasive, supported by the disparate treatment they received in comparison to white coworkers who received little to no punishment. Compl. ¶ 69.

Defendants cite to *Castleberry* in support of their argument that Plaintiffs' Complaint does not meet the "severe or pervasive" standard. Defs.' Mot. to Dismiss 21, ECF No. 7-3. However, Defendants cite the case for the wrong proposition. The *Castleberry* court was determining whether the correct standard to apply was "severe *or* pervasive" or "severe *and* pervasive." 863 F.3d at 264. In clarifying that the correct standard is the former, the *Castleberry* court's purpose was to allow isolated yet severe incidents of discrimination to be actionable under a hostile work environment claim. *Id.* at 264–65. Accordingly, Defendants' argument is

unpersuasive. If substantiated with evidence during discovery, Plaintiffs' claims of disparate treatment may constitute severe or pervasive discrimination, provided that the disparate treatment was tied to Plaintiffs' race or color.

### iii. Defendants' alleged racial discrimination would detrimentally affect a reasonable employee (Elements Three and Four)

Even if a plaintiff's alleged discrimination detrimentally affects her as an individual, the plaintiff must show that the discrimination would detrimentally affect a reasonable employee in the plaintiff's position as well. *See Shramban v. Aetna*, 115 F. App'x 578, 580 (3d Cir. 2004) (finding that, though the plaintiff was herself detrimentally affected by the "inappropriate [and] boorish" sexually charged comments from her supervisor, plaintiff failed to show that a reasonable employee in her position would be similarly detrimentally affected); *see also Felder v. Penn Mfg. Indus., Inc.*, 303 F.R.D. 241, 244 (E.D. Pa. 2014) (finding that racist remarks, intimidation, and physical confrontation would "create a hostile working environment to a reasonable individual."); *Mufti v. Aarsand & Co., Inc.*, 667 F. Supp. 2d 535, 551 (W.D. Pa. 2009) (finding that, because both white and African-American employees were subject to similar offensive remarks, a reasonable employee would not be detrimentally affected).

Plaintiffs allege that they were treated more harshly than white coworkers who were accused of similar or more egregious acts of misconduct. Compl. ¶ 69, ECF No. 1. Plaintiffs further allege that they were not the only racial minorities to receive disparate treatment from Defendants; Plaintiffs accuse Defendants of placing an African-American coworker on leave after racially charged threats were made against his life by a student and further accuse Defendants of lying to the FCS community about the nature of the coworker's leave. Compl. ¶ 68. Viewing these allegations as true and in the light most favorable to Plaintiffs, a reasonable

employee—who is a racial minority and therefore similarly situated as are Plaintiffs—could be detrimentally affected by such disparate treatment of white and minority coworkers.

### iv. Respondeat superior liability exists (Element Five)

Under the theory of respondeat superior, an employer bears responsibility for the actions of its employees. *Castleberry*, 863 F.3d at 263. Employers are strictly liable for the discriminatory actions of a plaintiff's supervisor. *In re Tribune Media Co.*, 902 F.3d 384, 399 (3d Cir. 2018). For Title VII purposes, "[a]n employee is a supervisor . . . if he . . . is empowered by the employer to take tangible employment actions . . . such as hiring [or] firing." *Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 216 (3d Cir. 2017). Liability exists if the person accused of creating the hostile work environment is the plaintiff's supervisor. *Frazier v. Henry H. Ottens Mfg. Co., Inc.*, No. 11-3987, 2012 WL 1137051, at *8 (E.D. Pa. Apr. 5, 2012).

Plaintiffs' Complaint largely focuses on the alleged discrimination they suffered at the hands of Defendant Sellers. Compl. ¶¶ 2, 6, 17, 42, 49, 57, ECF No. 1. There is no dispute that Sellers was Plaintiffs' supervisor at all times relevant to this Complaint, nor is there a dispute that he was empowered by FCS to take tangible employment actions against FCS employees. Compl. ¶ 6. Accordingly, Plaintiffs have plead respondeat superior liability and all the elements of their race or color-based hostile work environment claim.

### 2. Plaintiffs Have Sufficiently Pled Race or Color-Based Discrimination

To state a prima facie case of discrimination under Title VII, a plaintiff must show that "(1) she is a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) similarly situated non-protected members were treated more favorably." *Saidu-Kamara v. Parkway Corp.*, 155 F. Supp. 2d 436, 440 (E.D. Pa. 2001). Plaintiffs have satisfied all four of these elements.

Title VII and the PHRA protects employees of classes based on race, color, religion, sex, or national origin. *See* Title VII, 42 U.S.C. § 2000e-2; PHRA, 43 Pa. Stat. And. Cons. Stat. Ann. § 952 (West 2019). Plaintiffs established that they are members of protected classes based on race, color, and sex; Plaintiff Helwa is additionally a member of a protected class based on religion. Compl. ¶¶ 3–4, ECF No. 1.

Plaintiffs appear to have been qualified for their positions and this point is not contested by Defendants. Plaintiffs hold degrees from undergraduate institutions and were both in their second year of teaching at FCS when they were suspended and terminated. Compl. ¶¶ 3–4, 11. Plaintiffs received positive feedback on their teaching skills from Sellers and Hall, including positive remarks in their files and direct communications from Sellers and Hall complimenting Plaintiffs' teaching skills. Compl. ¶ 16. Plaintiffs had only received positive feedback from Defendants prior to their suspension and were popular with their students. Compl. ¶¶ 11, 16.

While a paid suspension is not an adverse employment action, a discriminatory termination is. *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 326 (3d Cir. 2015). Accordingly, though Plaintiffs' paid suspension does not constitute an adverse employment action, Plaintiffs' termination may have constituted an adverse employment action if it was discriminatory in nature. Plaintiffs have alleged that non-protected employees were treated more favorably than were Plaintiffs by offering several scenarios where white coworkers were treated leniently following acts of misconduct. Compl. ¶ 69. Plaintiffs allege that white coworkers engaged in behavior such as failing to turn in student grades, refusing to attend faculty meetings, and leaving a written comment on a dyslexic student's essay asking if she was ill. Compl. ¶ 69. Plaintiffs allege that these white coworkers were either not disciplined or received only minimal discipline. Compl. ¶ 69. Accordingly, Plaintiffs have shown that similarly situated non-protected employees

were treated more favorably than were Plaintiffs and have, therefore, satisfied the prima facie elements of discrimination on the basis of race or color.

### 3. Plaintiffs Have Sufficiently Pled Retaliation in Violation of Title VII and the PHRA

A plaintiff claiming retaliation must show "(1) that she engaged in protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015).

Filing an internal discrimination claim with management is a protected activity, as is filing a formal complaint with the EEOC. *See id.* (even informal complaints of discrimination to management qualify as protected conduct); *Fasold v. Justice*, 409 F.3d 178, 188 (3d Cir. 2005) (filing a claim with the EEOC is protected conduct). Here, Plaintiffs engaged in protected employee activity by filing a complaint with the EEOC and by filing an internal complaint against Sellers to the Board. Compl. ¶¶ 10, 42, ECF No. 1. As noted above in Section III.A.2, Plaintiffs' termination may qualify as an adverse action. Plaintiffs were terminated following the filing of the internal discrimination complaint and the EEOC complaint. Compl. ¶ 58. Therefore, Plaintiffs have shown that Defendants' adverse action occurred after Plaintiffs engaged in a protected activity.

In analyzing whether a causal connection exists, a court may consider "any . . . evidence suggesting that the employer had a retaliatory animus when taking the adverse action." *Daniels*, 776 F.3d at 196. Additionally, the plaintiff must offer evidence "that the individual responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted." *Id.* Plaintiffs provided sufficient evidence of racially charged discriminatory animus on the part of Defendants, exhibited through the lenient punishments given to white coworkers when compared

to the severe punishment of Plaintiffs, including termination. Compl. ¶ 69. It is undisputed that, at the time of Plaintiff's termination, Sellers was aware of Plaintiffs' internal complaint against him and the EEOC complaint. Compl. ¶¶ 42, 67, ECF No. 1. Taking Plaintiffs' allegations as true and viewing them in a light most favorable to Plaintiffs, Plaintiffs have established a prima facie case of retaliation.

### 4. Plaintiffs Have Failed To State a Claim of Discrimination, Hostile Work Environment, or Retaliation on the Bases of Religion or Sex

Unlike their claims of race or color-based discrimination, Plaintiffs have failed to plead any facts or information that show that they, or any other employees of FCS, were ever discriminated against based on their religion or sex. While Plaintiffs offer several scenarios where white coworkers were treated more fairly than were racial minorities, those scenarios encompass instances of misconduct perpetrated by both male *and* female coworkers and similarly fail to offer any situations where religion appeared to play a role in how Defendants disciplined their employees. Compl. ¶ 69. Even when read liberally, no facts alleged in Plaintiffs' Complaint allow the Court to infer that Defendants discriminated against Plaintiffs on the bases of religion or sex. A plaintiff's mere speculation that an employer would have treated her differently if she were not a member of a particular protected class does not sufficiently prove discrimination in the absence of evidence in the record. *Mitchell*, 556 F. Supp. 2d at 350.

Accordingly, all claims brought by Plaintiffs alleging discrimination on the bases of religion or sex are dismissed.

### B. Plaintiffs Have Sufficiently Pled Post-Employment Retaliation under Title VII (Count II)

Between February and May of 2017, Defendants released several statements to FCS families, alumni, and various news outlets concerning Plaintiffs, Plaintiffs' claims of

discrimination against FCS, and their suspension and subsequent firing. Compl. ¶¶ 50–66.

Plaintiffs allege that these public comments were retaliatory and have negatively affected their

reputations, preventing them from finding gainful employment following their termination from

FCS. Compl. ¶ 107, ECF No. 1. Plaintiffs further allege that Defendants' statement to FCS

families explaining that an off-campus meeting between Plaintiffs and students was not a school-

sponsored event was "malicious." Compl. ¶ 89. Finally, Plaintiffs allege they suffered post-

employment retaliation when Defendants attempted to obstruct Plaintiffs' ongoing EEOC

investigation. Compl. ¶ 89. Defendants argue that Plaintiffs' allegations do not meet the

threshold required to bring suit under Title VII for post-employment retaliation claims. Defs.'

Mot. to Dismiss 23, ECF No. 7-3.

Under Section 704(a) of Title VII, a plaintiff is entitled to bring a retaliation action

against a former employer for alleged retaliation that occurs after the employment relationship

has ended. *Charlton v. Paramus Bd. of Educ.*, 25 F.3d 194, 200 (3d Cir. 1994). To state a claim

of discriminatory post-employment retaliation under Title VII, a plaintiff must establish a prima

facie case by demonstrating that: "(1) she engaged in an activity protected by Title VII; (2) the

employer took an adverse employment action against her; and (3) there was a causal connection

between her participation in the protected activity and the adverse employment action." *Remp v.*

*Alcon Lab. Inc.*, 701 F. App'x 103, 107 (citing *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir.

1995)) (internal citations omitted). The alleged retaliation must occur "either after or

contemporaneous[ly] with the employee's protected activity." *Daniels*, 776 F.3d at 193.

### 1. Plaintiffs Engaged In A Protected Activity (Element One)

Filing an EEOC complaint, filing a discrimination complaint with internal management,

and filing a Title VII action are all protected activities under Title VII. *See Charlton*, 25 F.3d at

201 ("the filing of a Title VII action is protected conduct."); *Daniels*, 776 F.3d at 193 (even

informal complaints of discrimination to management qualify as protected conduct); *Fasold v.*

*Justice*, 409 F.3d 178, 188 (3d Cir. 2005) (filing a claim with the EEOC is protected conduct).

Here, Plaintiffs filed a complaint against Sellers to the Board (Compl. ¶ 42, No. 1.), have filed a

complaint with the EEOC (Compl. ¶ 10), and have also filed this Title VII action. Plaintiffs

allege that the retaliation occurred after they filed their complaint with the Board as well as after

filing the EEOC complaint and contemporaneously with filing this Title VII action. Plaintiffs

have, therefore, satisfied the first element.

### 2. Defendants Took Two Adverse Employment Actions Against Plaintiffs (Element Two)

To constitute an adverse employment action under Title VII, a plaintiff must demonstrate

that a reasonable employee would find the alleged retaliation "materially adverse" and sufficient

to dissuade "a reasonable worker from making or supporting a charge of discrimination."

*Daniels*, 776 F.3d at 195 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68

(2006)). "[P]etty slights . . . [and] minor annoyances" are not considered adverse employment

actions. *Burlington*, 548 U.S. at 68. Retaliation actions require a fact-specific analysis, such that

the act of a former employer in one situation may be "immaterial in some situations [and]

material in others." *Id.* at 69.

Defendants argue that Plaintiffs have failed to allege post-employment adverse action

under relevant law. Defs.' Mot. to Dismiss 23, ECF No. 7-3. Defendants cite various Third

Circuit cases where adverse employment actions were at issue. Defs.' Mot. to Dismiss 25. The

cases cited by Defendants were decided before the Supreme Court's decision in *Burlington* and

are therefore not persuasive nor dispositive in the Court's analysis.

Before *Burlington*, plaintiffs were required to show that the retaliation complained of created a hostile work environment that violated Title VII before protection from retaliation would apply. *Moore v. City of Phila.*, 461 F.3d 331, 341 (3d Cir. 2006). However, the Supreme Court held in *Burlington* that Title VII's anti-retaliation provision was not "limited to discriminatory actions that affect[ed] the terms and conditions of employment." *Burlington*, 548 U.S. at 64. Instead, the Court held that anti-retaliation protection can extend "beyond workplace-related or employment-related retaliatory acts and harm." *Id.* at 67. In light of this, a plaintiff's retaliation action under Title VII need only show that a reasonable employee would find the alleged actions "materially adverse," meaning the actions "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (internal citation omitted). Therefore, the Court declines to adopt Defendants' analysis of Third Circuit Title VII retaliation law and, after analyzing each allegation of retaliation made by Plaintiffs in a light most favorable to Plaintiffs, finds that Defendants took two adverse employment actions against Plaintiffs.

### i. Defendants' communication with FCS families and the media regarding Plaintiffs' suspension and firing is an adverse employment action

Retaliatory acts by a former employer that impede a plaintiff's current or future employment prospects may constitute an adverse employment action. *Nelson*, 51 F.3d at 388; *see also Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 157 (3d Cir. 1999) (explaining that post-employment retaliation may be considered discriminatory if the actions "hurt a plaintiff's employment prospects."); *Downs v. Schwartz*, No. 14-630, 2015 WL 4770711, at *11 (E.D. Pa. Aug. 12, 2015) (acts by a former employer that result in "some harm to an employee's employment opportunities" constitute adverse employment actions).

Plaintiffs allege that Defendants' public statements concerning the reasoning and nature of Plaintiffs' suspension and firing, lowered Plaintiffs' reputations in the community and prevented them from securing gainful employment. Compl. ¶ 107, ECF No. 1. Taking this allegation as true and viewing it in a light most favorable to Plaintiffs, the Court finds that Plaintiffs plead an adverse employment action.

### ii. Defendants' alleged attempted obstruction of Plaintiffs' EEOC complaint is an adverse employment action

Allegations of obstruction of an EEOC investigation may constitute an adverse employment action. *Stringer v. Mound Bayou Pub. Sch. Dist.*, No. 4:14-CV-000091-DMB-JMV, 2016 WL 183701, at *15 (N.D. Miss. Jan. 14, 2016) (holding that a supervisor instructing employees to give only 'yes' or 'no' answers and to be as vague as possible during an EEOC investigation was "akin to intimidating witnesses and, therefore, amount[ed] to an adverse action under the retaliatory framework."); *see also Ankeny v. Napolitano*, No. C09-1379-JCC, 2010 WL 5094687, at *4 (W.D. Wash. Dec. 7, 2010) (holding that a supervisor interfering with an EEOC investigation is an adverse employment action).

Plaintiffs allege that, when a teacher in a faculty meeting asked Sellers how to respond to EEOC questions regarding the open investigation, Sellers suggested that the teacher not comment to investigators. Compl. ¶ 67, ECF No. 1. Sellers, Plaintiffs allege, suggested the teacher "express support for the school" and direct EEOC investigators to FCS' communications office. Compl. ¶ 67. Taking these allegations as true, Sellers' instruction may constitute an adverse employment action.

### iii. Defendants' communication to FCS families about an off-campus event between Plaintiffs and students is not an adverse employment action

Not every action taken by the employer that offends or annoys the former employee will constitute an adverse employment action. *Remp*, 701 F. App'x at 107–08. Such "trivial inconveniences [will not] dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Id.* at 108 (quoting *Burlington*, 548 U.S. at 68).

Plaintiffs have failed to persuade the Court that the communication alerting FCS families that an off-campus meeting was not school-sponsored was anything more than a trivial inconvenience. Though Plaintiffs categorize the communication as a "malicious publication," (Compl. ¶ 89, ECF No. 1) the statement merely informed parents that Plaintiffs were planning to "gather with some [FCS] students off campus" later that day and, because Plaintiffs were on leave, that the event was not school-sponsored. Compl. ¶ 64.

The Court is not convinced that such a communication can be seen as malicious or retaliatory. Surely, parents should be informed about the status of an off-campus event that their children may potentially participate in. The trivial inconvenience experienced by Plaintiffs following this communication would not dissuade a reasonable employee from supporting their initial discrimination charge. This statement by FCS does not constitute an adverse employment action.

### 3. There Is a Causal Connection between Plaintiffs' Participation in a Title VII Protected Activity and Defendants Alleged Adverse Employment Actions Against Plaintiffs (Element Three)

To establish the causation element of retaliation under Title VII, the "plaintiff must establish that his protected activity was a but-for cause of the adverse action taken by his employer." *Downs*, 2015 WL 4770711, at * 12 (E.D. Pa. Aug. 12, 2015) (citing *Univ. of Tex. Sw.*

*Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013)). The Third Circuit interprets this to mean that the plaintiff must only provide evidence to "sufficient[ly] raise the inference that her protected activity was the *likely reason* for the adverse [employment] action." *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 259 (3d. Cir. 2017) (declining to adopt the rationale of other circuits that interpret *Nassar* as imposing a higher burden on plaintiffs at the prima facie stage) (emphasis in original).

To establish a causal link, "a plaintiff may rely on the [close] temporal proximity" of the protected activity and the adverse employment action if the timeframe is "unusually suggestive." *Daniels*, 776 F.3d at 196; *see Downs*, 2015 WL4770711, at *12 (noting that a proximity of two days is "unusually suggestive of retaliatory motive."). Further, the plaintiff must show that the individual(s) responsible for the adverse employment action knew of the protected activity taken by the employee at the time of the adverse action. *Id.*

Plaintiffs filed their complaint with the Board on February 14, 2017. Compl. ¶ 42, ECF No. 1. As noted above in Section III.B.1, this act is a protected activity. That day, Sellers released a communication which described "two teachers [that] were given explicit directives which they ignored," and explained that the teachers were placed on leave as a result. Compl. ¶ 51. That day, and in the ensuing days, Sellers' communication was published in several local and national news publications. Compl. ¶¶ 51–52. As the *Downs* court noted, even a two-day proximity between a protected activity and an adverse employment action is suggestive of retaliatory motive. *Downs*, 2015 WL 4770711, at * 12. A same-day proximity strongly suggests the same. The close temporal proximity of Sellers' communications with that of Plaintiffs' complaint with the Board could be "unusually suggestive of retaliatory motive." *Id.*

It is undisputed that Defendants were aware of Plaintiffs' engagement in the protected activities of filing a complaint with the Board and filing this Title VII action. The internal complaint was filed directly with the Board and with Sellers. Compl. ¶ 42. All Defendants were named in this Title VII action and were, therefore, aware that Plaintiffs had filed it. This fact is bolstered by the communication Sellers sent to FCS alumni on September 1, 2017 to alert them that the school would likely be named in a lawsuit in the fall. Compl. ¶ 66. There is a sufficient causal connection between Plaintiff's participation in these Title VII protected activities and the adverse employment actions taken by Defendants against them.

Taking all of Plaintiffs' factual allegations as true and making all inferences in favor of Plaintiffs, Plaintiffs have sufficiently pled post-employment retaliation under Title VII.

### C. Plaintiffs Have Sufficiently Pled Defamation (Count IV)

Plaintiffs allege that they were defamed in multiple communications made by Defendants to the media and the FCS community. Compl. ¶ 104, ECF No. 1. Plaintiffs further allege that these defamatory communications lowered their reputations in the community and have deterred others from "associating or dealing with [Plaintiffs]," which has prevented Plaintiffs from securing gainful employment following their termination. Compl. ¶ 107. Other than Defendants' general argument that all of Plaintiffs' claims should be dismissed as violations of the Establishment Clause, Defendants offer no specific argument as to why the Court should dismiss Plaintiffs' defamation claim. Defs.' Mot. to Dismiss 9–19, ECF No. 7-3.

Defamation is a state cause of action. *Tucker v. Fischbein*, 237 F.3d 275, 281 (3d Cir. 2001). For a communication to be defamatory under Pennsylvania law, the following elements must be met: (1) the communication is of a defamatory character; (2) the defendant published the communication; (3) the communication applied to the plaintiff; (4) the recipient of the

communication understood its defamatory meaning; (5) the recipient of the communication understood it as intended to be applied to the plaintiff; (6) the publication resulted in special harm to the plaintiff; and (7) there was an abuse of a conditionally privileged occasion. *Joseph v. Scranton Times L.P.*, 129 A.3d 404, 424 (Pa. 2015) (citing 42 Pa. Cons. Stat. § 8343(a)). At its core, "protection of an individual's reputation is the very essence of a claim for defamation." *Joseph*, 129 A.2d at 430.

A statement is considered defamatory if it harms the reputation of another by either lowering her reputation in the community or by deterring others from associating with her. *Tucker*, 237 F.3d at 282 (citing *Birl v. Phila. Elec. Co.*, 167 A.2d 472, 476 (Pa. 1960)). Plaintiffs allege that the communications in question have harmed their reputations and have caused others to be deterred from associating with Plaintiffs. It is undisputed that the communications in question were Defendants' publications and that these publications applied to Plaintiffs.

In determining whether a plaintiff has suffered the special harm needed under a defamation cause of action, the Pennsylvania Supreme Court has defined "special harm" to mean "general damages which are proven upon a showing of actual harm." *Joseph*, 129 A.3d at 416. Among other effects, "[a]ctual harm includes impairment of reputation and standing in the community." *Id.* Plaintiffs have alleged that their reputation and standing in the community have been harmed. Compl. ¶ 107, ECF No. 1. Plaintiffs have, therefore, suffered special harm within the meaning of the term under Pennsylvania law.

A defendant is liable for defamation unless he can prove that the statement "was subject to a privilege." *Id.* at 425. A communication is considered privileged if it is "made on a proper occasion, from a proper motive, and in a proper manner." *Tucker v. Merck & Co., Inc.*, 102 F. App'x 247, 253 (3d Cir. 2004). The circumstances must be such that the parties privy to the

communication must share a common interest in the communication's subject matter and must be entitled to the information contained in the communication. *Id.* at 253–54. In the employment context, this privilege generally applies to communications amongst management regarding an employee's discharge and discipline, such as communications regarding an employee's job performance or misconduct. *Maier v. Maretti*, 671 A.2d 701, 706 (Pa. Super. Ct. 1995). The Court is not convinced that Defendants' communications to the media regarding the discipline and termination of Plaintiffs were privileged. The media was not entitled to the personal information surrounding Plaintiffs' suspension and termination. Therefore, any communications between Defendant and the media regarding Plaintiffs' suspension and/or termination fail to meet the standard of a privileged communication.

Though the Court finds that some communications between Defendants and FCS families were privileged, the privilege is limited and does not extend to any language that would "impugn or blacken [Plaintiffs'] . . . reputation." *See Krolczyk v. Goddard Sys., Inc.*, 164 A.3d 521, 532 (Pa. Super. Ct. 2017) (holding that merely informing parents of teachers' terminations did not satisfy a defamation cause of action because the communication did not disclose the reason behind the terminations nor suggest that the teachers were incompetent or inept at their job). Defendants did not merely inform FCS parents that Plaintiffs had been suspended; on at least two occasions, Defendants disclosed the reason behind Plaintiffs' suspension while using language that could impugn or blacken Plaintiffs' reputations. First, Defendants stated that they had "very real concerns about the conduct of [Plaintiffs] for their disregard of . . . community peace and integrity." Compl. ¶ 50, ECF No. 1. Second, Defendants stated that Plaintiffs were placed on leave because they "were given explicit directives which they ignored." Compl. ¶ 51. These communications extend beyond any privilege between Defendants and parents because the

communications divulge the reason behind Plaintiffs' suspensions and the language used could potentially harm Plaintiffs.

While the Court finds that these two communications are not privileged, Defendants' communication to FCS parents that Plaintiffs had been fired was properly within the bounds of a privileged communication because it merely informed parents that Plaintiffs had been fired and communicated that the details of the termination would remain confidential. Compl. ¶ 59, ECF No. 1. Accordingly, Plaintiffs have adequately shown that certain communications between Defendants and FCS families were not privileged and have, therefore, satisfied the prima facie elements of defamation under Pennsylvania law sufficient to survive a motion to dismiss.

### D. Plaintiffs Have Sufficiently Pled False Light (Count V)

Plaintiffs allege that they were placed in a false light by Defendants' multiple statements referenced above in Section III.C. Compl. ¶ 120. Plaintiffs further allege that these statements "were not true, were highly offensive, and were publicized maliciously with knowledge, or in reckless disregard for their falsity." Compl. ¶ 120. As stated in Section III.C, Defendants only offer their general argument that all of Plaintiffs' claims should be dismissed as violations of the Establishment Clause and do not offer a specific argument as to why this false light claim should be dismissed. Defs.' Mot. to Dismiss 9–19, ECF No. 7-3.

The analysis of a defendant's statements under a false light claim is similar to that under a defamation claim. *Wallace v. Media News Grp., Inc.*, 568 F. App'x 121,127 (3d. Cir. 2014). Like a defamation cause of action, a false light cause of action is analyzed under Pennsylvania state law and liability attaches if the publication in question is "not true, is highly offensive to a reasonable person, and is publicized with knowledge or in reckless disregard of its falsity." *Graboff v. Colleran Firm*, 744 F.3d 128, 136 (3d. Cir. 2014) (internal citation omitted).

Additionally, the publication in question "must cause mental suffering, shame or humiliation" to a reasonable person. *Larsen v. Phila. Newspapers, Inc.*, 543 A.2d 1181, 1188 (Pa. Super. Ct. 1988) (internal quotations and citation omitted). Falsity of the materials in question "is defined broadly and can be established where . . . [the] presentation of [the] information . . . renders the publication susceptible to inferences casting [the plaintiff] in a false light." *Cheney v. Daily News L.P.*, 654 F. App'x 578, 583 (3d Cir. 2016) (quoting *Larsen*, 543 A.2d at 1189). False light causes of action also provide "recovery in tort for the disclosure of public . . . [and] private facts," even if they are true, to prevent the "mental suffering, shame or humiliation which may be caused by the . . . publication of such facts." *Larsen*, 543 A.2d at 1189.

Following the Court's analysis of Plaintiffs' defamation claim (Count IV), Plaintiffs have sufficiently pled false light at this prima facie stage. Plaintiffs allege that Defendants' statements which painted Plaintiffs' as inept teachers with disregard for FCS' core values, were untrue and, therefore, offensive. Reading Plaintiffs Complaint liberally, Plaintiffs allege that the information which was publicized by Defendants was false, highly offensive, and published by Defendants with knowledge or in reckless disregard of its falsity. Compl. ¶ 120, ECF No. 1. Before Plaintiffs' suspension and termination, Defendants consistently painted Plaintiffs in a seemingly positive light, which is in stark contrast to the negative light in which Plaintiffs were placed following their suspension and termination. Compl. ¶¶ 11, 16. Viewing Plaintiffs' allegations as true and in a light most favorable to them, Plaintiffs have adequately pled false light.

### E. Plaintiffs' Negligent Supervision Claim is Preempted by the PHRA (Count VI)

Plaintiffs allege that the Board's negligence in supervising Defendant Sellers allowed him to discriminate against Plaintiffs. Compl. ¶ 123, ECF No. 1. In response, Defendants argue that Plaintiffs' negligent supervision claim is pre-empted by the PHRA and should, therefore, be

dismissed. Defs.' Mot. to Dismiss 26–27, ECF No. 7-3. The Court agrees with Defendants' argument that Plaintiffs' claim is preempted by the PHRA and will, therefore, not discuss the merits of Plaintiffs' underlying negligence claim.

It is settled law that, in Pennsylvania, "negligent supervision claims arising out of discrimination cases . . . must be brought under the [PHRA]." *Randler v. Kountry Kraft Kitchens*, No. 11-474, 2012 WL 6561510, at *14 (M.D. Pa. Dec. 17, 2012); *see also Black v. Cmty. Educ. Centers, Inc.*, No. 13-6102, 2014 WL 859313, at *4 (E.D. Pa. Mar. 4, 2014) ("It is firmly established that negligent supervision claims arising out of discrimination cases . . . in . . . Pennsylvania must be brought under the PHRA."). The PHRA statute "must be strictly followed . . . because recognition of a common law action for the same claims would give the [plaintiff] an opportunity to circumvent the carefully drafted legislative procedures" of the state. *Murray v. Commercial Union Ins. Co.*, 782 F.2d 432, 436 (3d Cir. 1986). Negligent supervision claims are preempted by the PHRA "when . . . such claims arise from" the same set of facts as "the PHRA-prohibited discriminatory conduct." *Watkins v. Rite Aid Corp.*, No. 4:06cv00299, 2006 WL 2085992, at *4 (M.D. Pa. July 25, 2006).

Plaintiffs' PHRA and negligent supervision claims arise from the same set of facts, namely that Defendants discriminated against Plaintiffs, both collectively and individually by and through Defendant Sellers. Plaintiffs' negligent supervision claim arises out of this alleged discrimination. Accordingly, Plaintiffs' negligent supervision claim is preempted by the PHRA and is, therefore, dismissed.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion is DENIED IN PART and GRANTED IN PART. Plaintiffs' claims of Title VII and PHRA violations of a hostile work environment,

discrimination, and retaliation on the bases of religion, sex or sexual orientation (Counts I and III); and negligent supervision (Count VI) are DISMISSED. Claims of a hostile work environment, discrimination and retaliation on the bases of race or color under Title VII and the PHRA; post-employment retaliation; defamation; and false light (Counts I, II, III, IV, V) remain. An appropriate Order follows.